UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JESSIE J. BARNES,

                 Petitioner,

       v.                             **DECISION AND ORDER**

DONALD UHLER,                      6:18-CV-06428 EAW

                 Respondent.

_____

## INTRODUCTION

*Pro se* petitioner Jessie J. Barnes ("Petitioner") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the basis that he is being unconstitutionally detained in the custody of respondent Donald Uhler, the Superintendent of the Upstate Correctional Facility ("Respondent")[1]. (Dkt. 46). Petitioner is incarcerated pursuant to a judgment entered against him on August 31, 2009, in Monroe County Court. (Dkt. 36 at ¶ 1). Petitioner was sentenced to an aggregate prison term of 82 years to life on convictions for three counts of burglary in the second degree, one count of reckless endangerment in the first degree, one count of criminal mischief in the second degree, and one count of reckless

---

[1] After the instant action was commenced, Petitioner was transferred to the Southport Correctional Facility. (Dkt. 59). "When the Government moves a habeas petitioner after [he] properly files a petition naming [his] immediate custodian, the District Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release." *Rumsfeld v. Padilla*, 542 U.S. 426, 441 (2004). Petitioner's transfer thus has no impact on the Court's ability to resolve the instant matter.

driving.  (*See id.*).   Petitioner's sentence was subsequently reduced on appeal to an aggregate prison term of 35 years to life.  (*Id*.).

In his second amended petition, which is the operative pleading in this matter, Petitioner contends he is being held in violation of his constitutional rights for the following reasons: (1) he was denied "replacement counsel" in violation of his Sixth Amendment rights; (2) he was denied his constitutional right to proceed *pro se*; (3) the trial judge violated Petitioner's rights by failing to disqualify or recuse himself; (4) his conviction for reckless endangerment in the first degree was not supported by legally sufficient evidence; (5) his convictions on three counts of burglary in the second degree were contrary to the weight of the evidence; (6) the trial judge violated his constitutional rights by excluding him from the courtroom during portions of his criminal proceedings; (7) he was denied the effective assistance of trial counsel; (8) his constitutional right to a fair trial was violated; (9) his conviction as a persistent violent felony offender was unconstitutional; and (10) his sentence, as modified, was harsh and excessive.  (Dkt. 46 at 13-14).  For the reasons discussed below, the Court finds that Petitioner is not entitled to federal habeas corpus relief.

## **BACKGROUND**

### I.   **Underlying Crime and Investigation**

Petitioner's convictions arise out of three burglaries in the greater Rochester, New York area—one occurring on September 26, 2008, and two occurring on October 9, 2008. (Dkt. 36-2 at 205-06).  The September burglary took place at 2413 East Avenue in

Brighton, New York, while the October burglaries took place at 52 Westwood Drive in Perinton, New York, and 11 Lachnovar Parkway in Pittsford, New York.  (*Id.*).

On September 26, 2008, at approximately 12:00 p.m., Officer Julie Knutowicz of the Town of Brighton Police Department ("Officer Knutowicz") was dispatched to 2414 East Avenue based on a report of a suspicious male subject looking inside the windows of apartments.  (*Id.* at 12).  Officer Knutowicz further indicated that she located a black male subject standing near a 1992 Mercury Marquis (the "Mercury") who matched the description made by the complainant.  (*Id.*).  The individual in question identified himself to Officer Knutowicz as Petitioner and advised her that his vehicle, which was registered to his son, had broken down and would not start.  (*Id.*).  Through the windows of the Mercury, Officer Knutowicz observed several rolls of paper towels and a "medium size black suitcase."  (*Id.*).  Petitioner's father arrived and jump started the Mercury, and then left in the Mercury with Petitioner as a passenger.  (*Id.*).

Also on September 26, 2009, Officer Renee Stickles of the Brighton Police Department ("Officer Stickles") responded to a report of a burglary at 2412 East Avenue.  (*Id.* at 8).  The victims of the burglary advised Officer Stickles that they had left their condominium at approximately 7:45 a.m. and that when they returned home shortly after 4:00 p.m., they discovered that the door was unlocked, and the condominium had been ransacked and burglarized.  (*Id.*).  Many items were taken in the burglary, including "a significant amount of electronic equipment," a personal safe, various items of jewelry, eight rolls of Wegmans-brand paper towels, and a five-piece black luggage set.  (*Id.*).

On October 3, 2008, based in part on the information set forth above, Monroe County Court Judge Alex R. Renzi issued a seizure warrant authorizing "any police officer of the Brighton Police Department or any police officer of the state of New York" to "surreptitiously seize" the Mercury. (*Id*. at 18). The seizure warrant further authorized the placement of a global positioning system ("GPS") tracking device on the Mercury. (*Id*.).

On October 9, 2008, GPS surveillance of the Mercury showed it leaving the vicinity of 532 Upper Falls Boulevard in the City of Rochester and eventually traveling to Westwood Drive in Perinton. (*Id*. at 142). The Mercury then traveled to a location in East Rochester, where the driver, a black man, exited and "loaded some type of unknown property" into the trunk. (*Id*.). The Mercury then traveled to Lochnavar Parkway. (*Id*.). Surveillance officers thereafter observed a black man removing a television from 11 Lochnavar Parkway and placing it in the back seat of the Mercury. (*Id*.). The same individual then re-entered 11 Lochnavar Parkway and exited with what appeared to be a guitar case. (*Id*.). The surveillance officers approached the individual and attempted to take him into custody, but he entered the Mercury and led the officers on a vehicle chase and then a foot chase. (*Id*.). The individual was subsequently taken into custody and identified as Petitioner. (*Id*.). The owner of 11 Lochnavar Parkway positively identified the television and several items of jewelry found in the Mercury as belonging to her. (*Id*. at 142-43).

The burglary at 52 Westwood Drive also occurred on October 9, 2008. (*Id*. at 143). The victim of this burglary positively identified jewelry that was on Petitioner's person at the time of his arrest as belonging to her. (*Id*.).

Petitioner was interviewed by Investigators Patrick Ponticello ("Investigator Ponticello") and Mark Mori ("Investigator Mori") of the Town of Brighton Police Department. (*Id*. at 20). Petitioner denied having entered any homes. (*Id*. at 39, 43). On further questioning, Petitioner told Investigators Ponticello and Mori that he had "seen some stuff on the side of the road" and stopped to pick it up. (*Id*. at 45).

On October 9, 2009, Brighton Town Court Justice Karen Morris issued a search warrant for 532 Upper Falls Boulevard, Upper Apartment, in the City of Rochester. (Dkt. 36-2 at 168-69).

## II.   **Indictment and Pre-Trial Proceedings**

A Monroe County grand jury returned an indictment dated November 5, 2008, charging Petitioner with three counts of burglary in the second degree, one count of reckless endangerment in the first degree, one count of criminal mischief in the second degree, one count of reckless driving, one count of leaving the scene of an incident, and one count of "One-Way Violation: Designated Road." (Dkt. 36-2 at 205-08).

Petitioner was originally represented by Roger Brazill, Esq. of the Monroe County Public Defender's Office. (Dkt. 18 at 2). At a bail hearing in Monroe County Court (the "trial court") on November 10, 2008, Petitioner handed Monroe County Court Judge Richard A. Keenan (the "trial judge") a letter asking that he be assigned new counsel. (*Id*. at 6-7). The trial judge advised Petitioner that Mr. Brazill was "one of the top trial attorneys in this entire part of the state" and encouraged Petitioner to "try to work with him on this case." (*Id*. at 10). The trial judge then set bail in the amount of $25,000 cash or $75,000

bond, in response to which Petitioner stated that the trial judge was "trying to fuck [him]." (*Id*. at 11-12).

Petitioner thereafter sent additional letters to the trial court asking for new counsel and stating that Mr. Brazill was not authorized to file motions on Petitioner's behalf. (Dkt. 36-2 at 213-14, 218-19, 222-25, 253-54). A hearing was held before the trial judge on January 8, 2009, at which Mr. Brazill appeared on behalf of Petitioner. (Dkt. 18 at 14-15). At the outset of the hearing, Petitioner cut off and began to speak over the trial judge, who then cautioned Petitioner that if Petitioner continued to "shout at" or "talk over" him, Petitioner would be removed from the courtroom. (*Id*. at 15-16). Upon questioning from the trial judge, Mr. Brazill indicated that he had met with Petitioner on multiple occasions, although not as frequently as Petitioner would have liked due to difficulties occasioned by Petitioner being detained in the special housing unit. (*Id*. at 18). Mr. Brazill further reported that Petitioner had asked him to investigate information that Mr. Brazill did not feel was relevant to the charges. (*Id*. at 18-19). Mr. Brazill confirmed that he was willing to continue representing Petitioner but advised that Petitioner had "basically indicated that he [did] not wish to confer with [Mr. Brazill] any further and that would certainly hamper any defense in the case." (*Id*. at 19). The trial judge granted Petitioner's request for new counsel. (*Id*. at 19-20). However, the trial judge cautioned Petitioner that the new attorney was "going to be it" and that he would not grant any further requests for a new attorney without good cause. (*Id*. at 20-21). Petitioner then requested that Matthew Mix, Esq., who had represented him in another criminal matter, be assigned to his case. (*Id*. at 21-22). The

trial judge indicated that he would contact Mr. Mix and would assign him if he was willing to serve.  (*Id*. at 22-23).

Mr. Mix was subsequently appointed to represent Petitioner and appeared with him before the trial judge on January 15, 2009.  (*Id*. at 25-26).  Despite being represented by Mr. Mix, Petitioner continued to file *pro se* motions and to write letters to the trial court. (*Id*. at 48).

A suppression hearing was held before the trial judge on March 27, 2009.  (*Id*. at 43).  At the suppression hearing, the trial judge again had to caution Petitioner not to disrupt the courtroom and warn him that he would be removed if he did not comply.  (*Id*. at 48). The trial judge further advised Petitioner that he would not consider *pro se* motions, and that all motions needed to come through Mr. Mix.  (*Id*.).

On April 4, 2009, Petitioner sent a letter to the trial judge in which he stated that Mr. Mix was "a great man" but that Petitioner had "noticed errors in his effectiveness." (Dkt. 17-2 at 242).  Petitioner indicated that he felt that he and Mr. Mix "still [had] time to come together and right this ship," but that he was "not going to hesitate to relieve [Mr. Mix] of his duties as [Petitioner's] counsel" if he "experience[d] any more ineffectiveness from [Mr. Mix]."  (*Id*.).

On April 27, 2009, Petitioner sent another letter to the trial judge in which he stated that he was "having considerable problems out of Mr. Mix now" and claimed that Mr. Mix had "ignored [his] existence and neglected [his] case."  (*Id*. at 251).  Petitioner asked the trial judge to "remove [Mr. Mix] from [Petitioner's] cases immediately and order him to return all [Petitioner's] papers to him."  (*Id*. at 251).

Petitioner appeared before the trial judge with Mr. Mix on May 14, 2009.  (Dkt. 18 at 123).  The trial judge again had to repeatedly remind Petitioner to keep his voice down in the courtroom.  (*Id*. at 124, 129-30).  After announcing his decision on Petitioner's motion to suppress, the trial court again explained to Petitioner that he was represented by Mr. Mix and that all filings needed to come through Mr. Mix and not be filed by Petitioner *pro se*.  (*Id*. at 129-30).  Mr. Mix asked the trial judge to consider the *pro se* filings and the trial judge declined to do so, to which Mr. Mix took exception.  (*Id*. at 131-32).

At the conclusion of the appearance on May 14, 2009, Petitioner stated "I'm writing Patricia Marks.[2]  I don't want no lawyer.  I'll do my own case with my own papers.  I'm doing my own case.  [The prosecutor] done lie in front of these goddamn people.  I don't give a fuck."  (*Id*. at 134).  The trial judge did not respond to this statement by Petitioner, but merely thanked the court reporter for making a record.  (*Id*.).

On July 7, 2009, Petitioner filed a *pro se* motion asking the trial judge to remove Mr. Mix as counsel "due to his ineffectiveness."  (Dkt. 17-2 at 511-17).  Petitioner describes this motion as "requesting new counsel."  (Dkt. 46 at ¶ 44).

A pre-trial conference was held on July 9, 2009, before the trial judge.  (Dkt. 18 at 143).  Mr. Mix appeared on Petitioner's behalf at this conference.  (*Id*. at 143-44).  Numerous pre-trial issues were addressed at this appearance, and Mr. Mix consulted with Petitioner at times.  (*Id*. at 144-65).  Near the end of the conference, following a request by Mr. Mix that Petitioner not be shackled during the trial, the trial judge spoke to Petitioner

---

[2]　　At the time, the Honorable Patricia Marks was the supervising judge of the trial court.  (*See* Dkt. 36-1 at 11).

about his in-court conduct.  The trial judge noted that Petitioner was "behaving as an absolute gentleman right now" and advised that if Petitioner continued to conduct himself appropriately, the trial judge would consider the request regarding shackling.  (*Id*. at 165-67).  The trial judge further advised Petitioner that if he "yell[ed] out or act[ed] up" during the trial that the trial judge would "take whatever actions [he] need[ed]," which could "prejudice [Petitioner] in front of the jury."  (*Id*. at 167).

Petitioner was then given an opportunity to address the trial judge.  (*Id*. at 168). Petitioner addressed his perception that the officials at the Monroe County Jail were biased against him and would take action to deceive the trial judge into thinking that Petitioner needed to be shackled.  (*Id*. at 168-70).  Petitioner did not, at this appearance, indicate in any way that he wanted Mr. Mix removed as his counsel or that he wanted to represent himself.

## III.   <u>Trial, Post-trial Motions, and Sentencing</u>

A jury trial was held before the trial judge from July 13-22, 2009, with Mr. Mix representing Petitioner.  (Dkt. 18-3 at 1).  At the beginning of the trial, Petitioner was not shackled.  (*Id.* at 7).

On July 14, 2009, Petitioner initially refused to come to court due to confusion regarding whether he would be allowed to shower.  (*Id*. at 172-73).  The trial judge indicated that although the general policy at the Monroe County Jail was to allow a shower every other day, Petitioner would be allowed to shower before coming to court each day during trial.  (*Id*. at 173).  Later that day, during his opening statement, Mr. Mix attempted

to read to the jury a statement prepared by Petitioner, but the trial granted the prosecution's objection thereto.  (*Id*. at 207-08).

At the beginning of proceedings on July 16, 2009, the trial judge noted on the record that he had received on the previous day a "large motion" from Petitioner seeking to have new counsel assigned.  (*Id.* at 541).  The trial judge denied that motion.  (*Id*.).

Also on July 16, 2009, while the prosecutor was questioning Investigator Stephen Rosenbaum of the Irondequoit Police Department ("Investigator Rosenbaum"), Petitioner began speaking loudly enough that the trial judge had to instruct him to keep his voice down.  (*Id*. at 581-82).  The trial judge then excused the jury and had a conversation with Petitioner wherein the trial judge told Petitioner that he was speaking to Mr. Mix so loudly that it was "distracting from the proceedings" and making it difficult to hear the witness. (*Id*.).  Petitioner apologized, and the trial judge acknowledged that he had not thus far during the trial had "any problems with [Petitioner] that [the trial judge] couldn't address." (*Id*. at 583).  Petitioner then began to criticize the testimony Investigator Rosenbaum was providing, claiming that Investigator Rosenbaum was lying, and further complained that Mr. Mix was not objecting.  (*Id*. at 584).  The trial judge explained that Mr. Mix could only object where there was a legal basis to do so and that Petitioner needed "to let Mr. Mix do his job."  (*Id*. at 584-85).

At the proceedings on July 17, 2009, after the trial judge overruled an objection by Mr. Mix, the trial judge observed that Petitioner had noticeably reacted and stated, "Mr. Barnes, please.  I do not want you to react anymore every time I make a ruling.  I haven't said anything now for six days, and I want you to stop that in the courtroom."  (Dkt. 18-5

at 222).  Petitioner then said, "You fair to me?  You saying—just instructing this jury all

week. . . ," at which point the trial judge interrupted him and excused the jury.  (*Id*.).

Petitioner then stated, as the jury was leaving the courtroom:

> Trial be over by Wednesday, you deny every motion.  They been—the
> polices has five hours worth of police recordings.  Everything gone—all
> these polices going watch me commit a crime, and then you done deny every
> motion.  Me and you fair?  You telling me you're fair, Judge, and you done
> instructed the jury to be biased against me.  Three days—she been giving up
> testimony for six days, sir, all of a sudden the trial going to be over
> Wednesday? You fair?

(*Id*. at 222-23).  The trial judge then stated:

> For the record, Mr. Barnes is making these comments in a loud voice to The
> Court.  They were made while the jurors were in the courtroom and as they
> were leaving.  I have bent over backwards to keep him in the courtroom,
> despite his comments which have been loud.  The record should also reflect
> after every witness's cross-examination, Mr. Mix spends minutes, sometimes
> up to four, five, to six minutes speaking with his client after cross-examining
> witness, but I can't allow this to go on.  Mr. Barnes, I can't allow you to
> continue to act like this and you have now violated the order I gave you
> months ago, and have repeatedly.  I can't have you yelling in a loud voice
> making statements to the jury in their presence.  I have made the rulings
> based upon the law. I have tried to keep you in this courtroom as long as I
> can, but I told you what would happen if you continue to act up and violate
> my orders.

(*Id*. at 223).  The trial judge then ordered Petitioner removed from the courtroom, but

instructed that he be kept in the "back hallway" so that he could consult with Mr. Mix.  (*Id*.

at 223-24).  Petitioner then stated the following as he was being removed:

> I'm going to get a reversal anyway and they are going to get your ass off of
> that bench because you're a racist no good cracker. . . . Racist ass
> motherfucker.  You trying to make it like you some—you one side talking to
> me, I supposed to say what I supposed to say to you, right?  Man, get your
> hands off me, bitch.  You stupid ass cracker, you trying to create—don't push
> me, man.  I'm walking.  Keep your hands off me.

- 11 -

(*Id*. at 224).  The trial judge then made a finding on the record that Petitioner had waived his right to be present during trial due to his "disruptive, profane, threatening behavior," and having "repeatedly ignored [the trial court's] admonitions to behave and desist from" the same.  (*Id*.).

Mr. Mix then attempted to deliver Petitioner's papers to him, but reported that he was not in the back hallway.  (*Id*. at 225-26).  The trial judge stated that the deputies had probably taken Petitioner further back, and that "in light of some of the comments [the trial judge] heard Mr. Barnes direct towards the deputies" this was "understandable."  (*Id*. at 226).  The trial judge stated that he would make sure that Petitioner was close by so that Mr. Mix could confer with him before cross-examining any witness and indicated that "over the lunch period," he would attempt to have arrangements made to have a monitor set up to allow Petitioner to view the trial remotely.  (*Id*.).

Mr. Mix began the cross-examination of the witness who had been the on the stand when Petitioner was removed from the courtroom, but then asked for a recess to speak with Petitioner.  (*Id*. at 235-36).  Upon returning to the courtroom, Mr. Mix reported that Petitioner was willing to continue working with Mr. Mix but was "reluctant to participate" in a trial where he was not present in the courtroom.  (*Id*. at 236).  The trial judge explained that throughout that morning's proceedings, Petitioner had been calling the trial judge a racist in a voice loud enough for the jury to hear, as well as reacting in a highly animated fashion to the trial judge's rulings.  (*Id*. at 237).  The trial judge indicated that he would have a live feed of the trial set up for Petitioner to view.  (*Id*. at 238).  The trial judge further stated that he would be willing to reconsider the issue of excluding Petitioner from the

courtroom after the lunch hour, after Mr. Mix had a chance to speak to Petitioner.  (*Id*. at 240).

Court staff thereafter arranged a live feed of the proceedings for Petitioner.  (*Id*. at 289).   However, after additional witnesses testified, the deputies guarding Petitioner reported that he had asked to return to the jail, indicating that he had a headache and did not want to watch anymore of the trial.  (*Id*.).  Mr. Mix spoke to Petitioner and confirmed that the deputies' report was accurate.  (*Id*. at 291).  The trial judge granted the request and Petitioner was removed to the jail for the rest of the day.  (*Id*. at 292).  The trial judge advised Mr. Mix that if Petitioner wanted, going forward, he could be placed "right in the back of the courtroom" and allowed to "observe the proceedings in realtime with sound and video."  (*Id*. at 381).  The trial judge further asked Mr. Mix to explain to Petitioner that in the event he elected to testify on his own behalf, he would be required to comport himself appropriately.  (*Id*. at 381-82).

On July 21, 2009, and July 22, 2009, Petitioner observed the trial from the "lock up" behind the courtroom with live audio and video.  (*Id*. at 383-84).  The trial judge indicted on July 21, 2009, that he would not require Petitioner to be shackled in front of the jury in the event he elected to testify on his own behalf.  (*Id*. at 385).

Petitioner ultimately did testify on his own behalf.  When he was brought into the courtroom, he immediately began complaining about his treatment by the deputies and the trial judge's order that he be removed from the courtroom.  (*Id*. at 425-27).  The trial judge warned Petitioner that if he became disruptive, the trial judge would stop his testimony and have him removed from the courtroom.  (*Id*. at 427).  The trial judge further instructed

Petitioner to "stop making comments about The Court in front of the jury."  (*Id*. at 428).
Petitioner was not shackled when he testified.  (*Id*.).

Petitioner's direct examination proceeded without notable incident.  However, on
cross-examination, Petitioner repeatedly spoke over or criticized the trial judge for striking
his answers as non-responsive.  (*Id*. at 491-92, 494).  Eventually, the trial court excused
the jury and had Petitioner removed from the courtroom.  (*Id*. at 494-95).  Petitioner
observed the remainder of the defense case via live video and audio feed from the back
hallway of the courthouse.  (*Id*. at 496).  The prosecution did not move to strike Petitioner's
direct examination.  (*Id*. at 497).

The jury found Petitioner guilty on all charges.  (*Id*. at 638-40).  Mr. Mix filed an
"extensive" motion to set aside the verdict on behalf of Petitioner (Dkt. 18-6 at 2; Dkt. 36-
2 at 573-83), which the trial judge denied (Dkt. 18-6 at 3).  On August 31, 2009, the trial
judge adjudicated Petitioner a persistent violent felony offender and sentenced him to an
aggregate term of 82 years to life imprisonment.  (Dkt. 18-8 at 4, 23-26).

## IV.   Direct Appeal

Petitioner appealed, arguing that: (1) the trial judge should have assigned
replacement counsel for Mr. Mix; (2) the trial judge should have allowed Petitioner to
proceed *pro se*; (3) the trial judge should have recused himself from the case; (4) the
evidence was legally insufficient to support his conviction of reckless endangerment in the
first degree; (5) the verdict was against the weight of the evidence; (6) the trial judge abused
his discretion in removing Petitioner from the courtroom; (7) Petitioner was denied the
effective assistance of counsel; (8) Petitioner's right to a fair trial was violated; (9)

Petitioner was improperly sentenced as a persistent violent felony offender; and (10) the sentence imposed was harsh and excessive.   (Dkt. 36-2 at 809-10).   Petitioner was represented on direct appeal by John A. Cirando, Esq., Bradley E. Keem, Esq., and Elizabeth deV. Moeller, Esq.  (*Id*. at 882).

On December 22, 2017, the New York State Supreme Court, Appellate Division, Fourth Department (the "Appellate Division") issued a decision modifying the judgment "as a matter of discretion in the interest of justice" to an aggregate term of 35 years to life imprisonment and unanimously affirming the judgment as modified.   *People v. Barnes*, 156 A.D.3d 1417, 1418 (4th Dep't 2017).  The Appellate Decision found that: (1) the trial judge did not err in failing to replace Mr. Mix as counsel because Petitioner's "requests for that attorney to be relieved consisted of conclusory assertions of disagreements concerning strategy and of ineffectiveness of counsel, as well as assertions that the attorney had not spoken to him often enough about the case, and the requests were thus insufficient to require any inquiry by the court"; (2) Petitioner was not denied the right to proceed *pro se* because the record did not "establish that he made an unequivocal request to do so"; (3) there had been no demonstration of bias on the part of the trial judge and recusal was thus not required; (4) Petitioner failed to preserve for review his contention that the evidence was legally insufficient to support his conviction of reckless endangerment in the first degree and, in any event, the evidence was legally sufficient to support a conviction on this count; (5) the verdict was not against the weight of the evidence; (6) the trial judge "did not abuse [his] discretion in having [Petitioner] removed from the courtroom when he became disruptive . . ., inasmuch as he had previously received adequate warnings that

such disruptive conduct could lead to his removal"; (7) Petitioner received the effective assistance of counsel; (8) Petitioner was not deprived of a fair trial; and (9) Petitioner was properly determined to be a persistent violent felony offender. *Id*. at 1418-21. However, the Appellate Division agreed that the sentence was "unduly harsh and severe" and, as a matter of discretion, reduced Petitioner's sentence to an aggregate sentence of 35 years to life. *Id*. at 1421. The New York Court of Appeals denied leave to appeal the Appellate Division's decision on May 7, 2018. *People v. Barnes*, 31 N.Y.3d 1078 (2018).

## V.    <u>Post-Judgment Motions</u>

On March 22, 2012, while his direct appeal was still pending, Petitioner filed a *pro se* motion to settle the record on appeal. (Dkt. 36-2 at 594-98). On February 13, 2013, Petitioner moved *pro se* to vacate the judgment pursuant to New York Criminal Procedure Law ("CPL") § 440.10, arguing that: (1) the prosecution knowingly presented false evidence pertaining to *modus operandi* of other burglaries that Petitioner could not have committed because he was incarcerated at the time they were committed; (2) the application for the seizure warrant authorizing GPS tracking contained materially false statements; (3) a court deputy engaged in "improper and prejudicial" conduct during the trial that did not appear in the record; (4) newly discovered evidence called into question the verdict; and (5) Mr. Brazill was ineffective in representing Petitioner. (*Id*. at 607-09). In the alternative, Petitioner requested that the exhibits attached to his § 440.10 motion be added to the record on direct appeal. (*Id*. at 609). The trial court denied Petitioner's § 440.10 motion on March 21, 2014. (*Id*. at 799). The trial court further denied Petitioner's motion to settle the record on appeal that same day. (*Id*. at 800).

VI.   **The Instant Action**

Petitioner commenced the instant action on June 11, 2018.  (Dkt. 1).  However, Petitioner initially failed to state what challenges he was raising to his conviction.  (*See* Dkt. 12 at 1).  On July 3, 2019, the Court entered an Order allowing Petitioner to file an amended petition.  (*Id*. at 3).  Petitioner filed an amended petition on August 29, 2019.  (Dkt. 16; Dkt. 17; Dkt. 18).  The Court then entered a scheduling order on September 13, 2019, requiring Respondent to file a response to the amended petition within 90 days.  (Dkt. 20).  The Court subsequently extended Respondent's deadline to February 14, 2020, at Respondent's request.  (Dkt. 29; Dkt. 33).

On November 11, 2019, Petitioner filed a motion for leave to file a second amended petition.  (Dkt. 25).  When Respondent filed his response on February 14, 2020, he addressed it to the proposed second amended petition.  (Dkt. 36).  The Court granted Petitioner's motion for leave to amend *nunc pro tunc* on June 1, 2020 (Dkt. 45), and the second amended petition was docketed that same day (Dkt. 46).  Petitioner filed his reply on June 3, 2020.  (Dkt. 47).

Petitioner thereafter filed various motions, including a motion to disqualify the undersigned, which were denied by Order entered on March 1, 2021.  (Dkt. 48; Dkt. 49; Dkt. 52; Dkt. 53).

On August 20, 2021, Petitioner filed a motion for immediate release.  (Dkt. 60). The Court addresses this motion below.

## DISCUSSION

### I.   Standard of Review

"Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d)(1), a federal court may not grant a state prisoner's habeas application unless the relevant state-court decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009) (quotation omitted). "The question is 'not whether the state court was incorrect or erroneous in rejecting petitioner's claim, but whether it was objectively unreasonable in doing so.'" *Edwards v. Superintendent, Southport C.F.*, 991 F. Supp. 2d 348, 367 (E.D.N.Y. 2013) (quoting *Ryan v. Miller*, 303 F.3d 231, 245 (2d Cir. 2002)). "The petition may be granted only if 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" *Id.* (alteration in original) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

### II.   Failure to Appoint Replacement Counsel

Petitioner's first argument is that his Sixth Amendment rights were violated by the trial judge's failure to replace Mr. Mix with new counsel.  (Dkt. 46 at 13).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.  "The Supreme Court has nevertheless recognized that the right to choose one's own counsel is not absolute." *United States v. Jones*, 381 F.3d 114, 119 (2d Cir. 2004) (citing *Wheat v. United States*, 486 U.S. 153 (1988)).  More specifically, "[t]he Sixth

Amendment guarantees a criminal defendant an effective advocate, not necessarily the advocate of his or her choosing." *Id*. "Because the right to counsel of one's choice is not absolute, a trial court may require a defendant to proceed to trial with counsel not of defendant's choosing; although it may not compel defendant to proceed with incompetent counsel." *United States v. Schmidt*, 105 F.3d 82, 89 (2d Cir. 1997).

Whether to grant a motion to substitute counsel is within the discretion of the trial court. *United States v. John Doe No. 1*, 272 F.3d 116, 122 (2d Cir. 2001). "[W]here a defendant voices a seemingly substantial complaint about counsel, the [trial] court should inquire into the reasons for dissatisfaction. However, if the reasons proffered are insubstantial and the defendant receives competent representation from counsel, a court's failure to inquire sufficiently or to inquire at all constitutes harmless error." *Id*. at 123 (citations omitted).

Here, the Appellate Division did not unreasonably apply clearly established federal law in finding that Petitioner's complaints regarding Mr. Mix were not substantial enough to require further inquiry by the trial judge. In his letter to the trial judge dated April 4, 2009, Petitioner expressly indicated his willingness to continue working with Mr. Mix, whom he described as a "great man." (Dkt. 17-2 at 242). Petitioner's letter dated April 27, 2009, was stated in conclusory terms, and made the wholly unsupported allegation that Mr. Mix had "taken it upon himself to not prosecute [Petitioner's] case" in retaliation for Petitioner's early complaints. (*Id*. at 251-52). In his *pro se* motion filed in July 2009 seeking replacement counsel, Petitioner stated that Mr. Mix had failed to make certain arguments that Petitioner wanted him to make, made the conclusory assertion that Mr. Mix

was "constantly exaggerating and not doing any meaningful work" on Petitioner's case, and complained about the frequency with which Mr. Mix was speaking to him. (*Id*. at 511-17).  None of these documents identified a substantial complaint by Petitioner regarding Mr. Mix's performance.  It is well-established that the Sixth Amendment does not "guarantee[] a meaningful relationship between an accused and his counsel."  *Morris v. Slappy*, 461 U.S. 1, 14 (1983) (quotation omitted).

Petitioner's disagreement with aspects of Mr. Mix's legal strategy and his subjective belief that Mr. Mix was not devoting sufficient time to his case were not sufficient to require additional inquiry by the trial court.  Further, as discussed in detail later in this Decision and Order, Mr. Mix provided Petitioner with competent, effective assistance.  On the record before the Court, the Appellate Division's rejection of Plaintiff's claim that his rights were violated when the trial court failed to replace Mr. Mix as counsel was entirely reasonable.

## III.   Failure to Allow Petitioner to Proceed *Pro Se*

Petitioner next argues that his constitutional right to represent himself was violated by the trial judge.  (Dkt. 46 at 13).

"The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. . . .  A defendant therefore has a constitutional right to waive the right to assistance of counsel and present [his] own defense *pro se*, if the decision is made knowingly and intelligently."  *Clark v. Perez*, 510 F.3d 382, 394 (2d Cir. 2008) (quotation omitted).  "A criminal defendant must make a timely and unequivocal request to proceed *pro se* in order to ensure

the orderly administration of justice and prevent the disruption of both the pre-trial proceedings and a criminal trial." *Williams v. Bartlett*, 44 F.3d 95, 99 (2d Cir. 1994). "Equivocation, which sometimes refers only to speech, is broader in the context of the Sixth Amendment, and takes into account conduct as well as other expressions of intent." *Id*. at 100.

Further, "[o]nce asserted, . . . the right to self-representation may be waived through conduct indicating that one is vacillating on the issue or has abandoned one's request altogether." *Id*.; *see also Wilson v. Walker*, 204 F.3d 33, 37 (2d Cir. 2000) ("[A] waiver may be found if it reasonably appears to the court that defendant has abandoned his initial request to represent himself." (citation omitted)). "Where there has been no clear denial of the request to proceed *pro se* and the question of self-representation is left open for possible further discussion, the defendant's failure to reassert his desire to proceed *pro se* and his apparent cooperation with his appointed counsel, who conducts the remaining pretrial and trial proceedings, constitutes a waiver of his previously asserted Sixth Amendment right to proceed *pro se*." *United States v. Barnes*, 693 F.3d 261, 272 (2d Cir. 2012) (quotations and alterations omitted).

Here, the only time that Petitioner indicated he wished to represent himself was at the end of the suppression hearing on May 14, 2009, when he stated: "I'm writing Patricia Marks.  I don't want no lawyer.  I'll do my own case with my own papers.  I'm doing my own case.  [The prosecutor] done lie in front of these goddamn people.  I don't give a fuck." (Dkt. 18 at 134).  Petitioner had been upset throughout the appearance, and the trial judge had had to ask him to contain himself.  Petitioner's statement was also clearly premised on

his unhappiness with the prosecution's conduct and the trial judge's rulings.  Further, in a letter dated May 14, 2009, and received by the trial judge on May 26, 2009, Petitioner repeatedly referred to Mr. Mix as his lawyer and made no mention that he wished to represent himself.  (Dkt. 17-2 at 444-47).  It was not unreasonable for the Appellate Division to conclude, based on all the relevant circumstances, that Petitioner was not making an unequivocal request for self-representation.

Petitioner's subsequent conduct confirms that he did not unequivocally invoke his right to self-representation.  On no other occasion did Petitioner mention his purported request to proceed *pro se*, and he specifically made no mention of it in his request for new counsel filed in July 2009.  He further consulted with Mr. Mix at the pretrial conference on July 9, 2009, and throughout the trial and sentencing.  On this record, Petitioner cannot demonstrate a denial of his right to self-representation.

## IV.   <u>Failure to Recuse</u>

Petitioner's next argument is that the trial judge's refusal to recuse himself violated Petitioner's constitutional rights.  (Dkt. 46 at 13).

"[N]ot all questions of judicial qualification involve constitutional validity."  *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820 (1986) (quotation and original alterations omitted).  "Mere allegations of judicial bias or prejudice do not state a due process violation."  *Brown v. Doe*, 2 F.3d 1236, 1248 (2d Cir. 1993); *see also Aetna Life Ins.*, 475 U.S. at 821 ("[O]nly in the most extreme cases would disqualification [on the basis of bias or prejudice] be constitutionally required.").  Importantly, "judicial rulings alone almost never constitute valid basis for a bias or partiality recusal motion" and "they require recusal

only when they evidence such deep-seated favoritism or antagonism as would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 541 (1994).

Here, Petitioner's claim that the trial judge was unfairly biased against him arises almost entirely from the trial judge's rulings.  Petitioner has made no showing that the trial judge's rulings evidenced the sort of deep-seated antagonism necessary to make out a constitutional violation.

Petitioner has also made the conclusory assertion that the trial judge was motivated by racial prejudice, but the only factual support for this claim appears to be the trial judge's statement during trial that he would not permit Petitioner to argue generally "that 'the system' was prejudiced against African Americans."  (Dkt. 46 at ¶¶ 157-58).  This ruling by the trial court does not, as Petitioner argues, constitute a "prejudice[d] remark" about Petitioner's race.  (*Id*. at ¶ 157).  The trial judge explained that his concern was making certain that any testimony by Petitioner was "related to the issues contained in the indictment and the proof that has been presented."  (Dkt. 18-5 at 185).  The trial judge's desire to keep Petitioner's trial testimony focused on the charges against him is not evidence that the trial court acted based on racial bias.

Nor does the fact that Petitioner filed a complaint regarding the trial judge with the New York State Commission on Judicial Conduct in June 2009 (*see* Dkt. 46 at ¶ 154) establish that recusal was constitutionally mandated.  Having a complaint filed against oneself is "not a situation where the average judge would be unable 'to hold the balance nice, clear, and true between the state and the accused.'"  *Martuzas*, 983 F. Supp. at  92 (quoting *Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972)); *see also Ungar v.*

*Sarafite*, 376 U.S. 575, 584 (1964) ("We cannot assume that judges are so irascible and sensitive that they cannot fairly and impartially deal with resistance to their authority or with highly charged arguments about the soundness of their decisions.").

The Appellate Division reasonably concluded that the record did not support Petitioner's claim of bias on the part of the trial judge and that recusal was not required. Petitioner is not entitled to federal habeas corpus relief on this basis.

## V.   Legal Sufficiency of the Evidence on Conviction for Reckless Endangerment

Petitioner's next argument is that his conviction for reckless endangerment in the first degree was not supported by legally sufficient evidence.  (Dkt. 46 at 13).

As a threshold matter, Respondent contends that this claim fails because the Appellate Division's decision rested on independent and adequate state procedural grounds.  (*See* Dkt. 36-1 at 30).   "[T]he independent and adequate state ground doctrine . . . applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement."  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).   In this context, "independent" means that "the last state court to consider the claim rendering a judgment in the case clearly and expressly rested its judgment on a state procedural bar."  *Perez v. Lempke*, No. 10-cv-0303, 2011 WL 2746785, *2 (W.D.N.Y. July 13, 2011).   "Adequate" means that the state court's determination was "based on a rule that is 'firmly established and regularly followed by the state in question.'"  *Id.* at *2 (quoting *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999)).

Here, the Appellate Division determined that Petitioner's challenge to the legal sufficiency of the evidence had not been preserved—that is, that Petitioner had not made a

contemporaneous objection on this point.  The Second Circuit has "held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule."  *Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011).  Accordingly, this Court can reach Petitioner's legal sufficiency of the evidence claim only if Petitioner demonstrates cause for the failure to preserve and prejudice attributable thereto, *see Rhagi v. Artuz*, 309 F.3d 103, 106 (2d Cir. 2002), or if he can demonstrate "a constitutional violation that resulted in a fundamental miscarriage of justice, *i.e.*, that he is actually innocent of the crime for which he has been convicted," *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002).  Neither of these standards is satisfied here.  The Appellate Division considered the merits of Petitioner's argument in the alternative, and so there was no prejudice.  *See Swail v. Hunt*, 742 F. Supp. 2d 352, 360 (W.D.N.Y. 2010) (finding no prejudice with respect to unpreserved challenge to sufficiency of the evidence "because the Appellate Division considered the 'insufficiency of the evidence' claim on the merits notwithstanding the lack of preservation and concluded that there was legally sufficient evidence to support the jury's guilty verdict").  There is also nothing in the record before the Court to support a finding that Petitioner is factually innocent with respect to the reckless endangerment conviction.  Accordingly, the Court is barred from granting federal habeas corpus relief as Petitioner's legal insufficiency claim.

## VI.  <u>Weight of the Evidence as to the Burglary Convictions</u>

Petitioner's next argument is that his three convictions for burglary in the second degree were contrary to the weight of the evidence.  (Dkt. 46 at 13-14).  "It is well established that a 'weight of the evidence' claim does not provide a basis for federal habeas

relief." *Clark v. Noeth*, 351 F. Supp. 3d 369, 372 (W.D.N.Y. 2019); *see also McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011) ("[T]he argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus." (collecting cases)). "[A]s a matter of federal constitutional law a jury's verdict may only be overturned if the evidence is insufficient to permit any rational juror to find guilt beyond a reasonable doubt," *McKinnon*, 422 F. App'x at 75. This is plainly not such a case—as the Appellate Division explained, the evidence adduced at trial, including "evidence that property stolen in each of the burglaries was found in [Petitioner's] car or his home," was sufficient to support the burglary convictions. *Barnes*, 156 A.D.3d at 1420.

**VII.   Petitioner's Expulsion from the Courtroom**

Petitioner's next claim is that his constitutional rights were violated when the trial judge had him removed from the courtroom during portions of the trial. (Dkt. 46 at 14).

"One of the most basic of the rights guaranteed by the Confrontation Clause [of the Sixth Amendment] is the accused's right to be present in the courtroom at every stage of his trial." *Illinois v. Allen*, 397 U.S. 337, 338 (1970). However, it is also "essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country" and so "a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Id*. at 343. "[T]rial judges confronted with disruptive,

contumacious, stubbornly defiant defendants" have "at least three constitutionally permissible ways" to proceed: "(1) bind and gag [the defendant], thereby keeping him present; (2) cite [the defendant] for contempt; (3) take [the defendant] out of the courtroom until he promises to conduct himself properly." *Id*. at 343-44.

The Appellate Division reasonably applied the relevant law in concluding that the trial judge appropriately removed Petitioner from the courtroom "inasmuch as he had previously received adequate warnings that such disruptive conduct could lead to his removal." *Barnes*, 156 A.D.3d at 1420. The record in this case demonstrates that Petitioner engaged in disruptive courtroom conduct from virtually the very beginning of his criminal proceedings, and that the trial judge warned him on numerous occasions of the potential consequences of such conduct. The trial judge further afforded Petitioner significant leeway at trial, intervening initially only when Petitioner's conduct became so disruptive as to interfere with the ability to hear the witness. The trial judge allowed Petitioner to remain in the courtroom after Petitioner temporarily ceased this conduct, but Petitioner then resumed acting in a disruptive matter. When the trial judge instructed Petitioner to stop, Petitioner, in front of the jury, accused the trial judge of being biased and unfair to him, then went on a tirade that concluded with him referring to the trial judge as a "a racist no good cracker" and a "[r]acist ass motherfucker." (Dkt. 18-5 at 224).

The trial judge then allowed Petitioner back into the courtroom so that he could testify on his own behalf, after Petitioner agreed that he would comport himself appropriately. (*Id*. at 428). The trial judge again warned Petitioner that he would be removed from the courtroom if he became disruptive. (*Id*. at 427). Petitioner nevertheless,

during his cross-examination, continued to engage in disruptive conduct.  On these facts, the Appellate Division reasonably found that the trial judge was justified in removing Petitioner from the courtroom.  *See Jones v. Murphy*, 694 F.3d 225, 241 (2d Cir. 2012) ("Although the right to be present at one's own trial is a right of paramount importance, appellate courts—let alone courts considering a case on collateral review many years later—lack the direct perception of the situation that informs the trial court's judgment. This distance from courtroom realities explains why we review decisions to exclude a defendant for abuse of discretion.  When that fact-specific standard of review is viewed through the additionally deferential lens of § 2254(d), the bar to relief is a high one." (quotation and citation omitted)).  Petitioner's subjective belief that he was being treated unfairly by the prosecutor and the trial judge does not change this conclusion.  *See Norde v. Keane*, 294 F.3d 401, 413 (2d Cir. 2002) (finding that trial judge was within discretion to remove the defendant from the courtroom where he twice disrupted jury selection with "objections," one of which was a "yell," and explaining that "[t]he fact that [the defendant's] conduct may have been based on what he believed to be a compelling reason . . . does not excuse his misconduct").

## VIII.  <u>Ineffective Assistance of Counsel</u>

Petitioner's next argument is that he was denied the effective assistance of counsel. (Dkt. 46 at 14).  Petitioner identifies the following ways in which he contends Mr. Mix was ineffective: (1) Mr. Mix failed to ensure that the trial judge would consider Petitioner's *pro se* filings in support of Petitioner's motion to suppress; (2) Mr. Mix failed to question Investigator Ponticello regarding possible entrapment during the suppression hearing and

further "made no effort to advance [an] entrapment defense"; (3) Mr. Mix failed to seek the trial judge's recusal or to "make [an] adequate record" of the trial judge's purported bias towards and intimidation of Petitioner; (4) Mr. Mix failed to demand certain disclosures regarding the GPS tracking device installed on the Mercury; (5) Mr. Mix negligently waived Petitioner's privacy rights in the apartment on Upper Falls Boulevard; (6) Mr. Mix failed to argue that the video recording of Petitioner's interrogation was altered; (7) Mr. Mix failed to meet with Petitioner sufficiently frequently; (8) Mr. Mix failed to appropriately seek additional disclosures from the prosecution after being "shown pictures of front yard of Lochnavan [sic] Parkway and nothing else"; (9) Mr. Mix failed to obtain the "ordinance concerning high-speed chase"; (10) Mr. Mix failed to "bring forth on record . . . the thunderously loud swearing match, jury escort provoked premised on sarcastic comments on removal of TV from over fireplace at 11 Lochnavar Parkway crime scene which erupted just outside of door of jury members chambers"; (11) Mr. Mix failed to seek certain evidence regarding radio transmissions between members of the surveillance team and further failed to "raise a single objection during direct examination . . . of surveillance team members"; (12) Mr. Mix's motion for dismissal was too general and Mr. Mix failed to preserve Petitioner's challenge to the legal sufficiency of the evidence on the reckless endangerment conviction; and (13) Mr. Mix failed to withdraw notwithstanding his "obvious irreconcilable conflicts and other communication issues with Petitioner." (Dkt. 46-1 at ¶¶ 221-35).

"The Sixth Amendment requires effective assistance of counsel at critical stages of a criminal proceeding." *Lafler v. Cooper*, 566 U.S. 156, 165 (2012). "Pursuant to the well-

known two-part test of *Strickland v. Washington*, 466 U.S. 668 (1984), a habeas petitioner alleging ineffective assistance of counsel 'must demonstrate (1) that his counsel's performance fell below what could be expected of a reasonably competent practitioner; and (2) that he was prejudiced by that substandard performance.'" *Woodard v. Chappius*, 631 F. App'x 65, 66 (2d Cir. 2016) (quoting *Pearson v. Callahan*, 555 U.S. 223, 241 (2009)). A court need not address both components of the *Strickland* inquiry if a petitioner makes an insufficient showing on one. *Garner v. Lee*, 908 F.3d 845, 861 (2d Cir. 2018) ("[T]he object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (citation omitted)), *cert. denied*, 139 S. Ct. 1608 (2019).

Moreover, where a state court has rejected the ineffective assistance of counsel claim, a "doubly deferential standard of review that gives both the state court and the defense attorney the benefit of the doubt" applies on federal habeas review. *Burt v. Titlow*, 571 U.S. 12, 15 (2013).  "[T]he burden to show that counsel's performance was deficient rests squarely on the defendant . . . [T]he absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Burt*, 571 U.S. at 22-23 (quotations and original alterations omitted).

As an initial matter, of the thirteen alleged missteps by Mr. Mix set forth above, only five were presented to the Appellate Division:  the failure to ensure that the trial judge considered the arguments made in Petitioner's *pro se* submissions regarding the motion to suppress;  the failure to seek the trial judge's recusal;  the failure to obtain radio

transmissions; the filing of a general motion to dismiss and associated failure to preserve the legal sufficiency claim; and the failure to move to withdraw.  (Dkt. 36-2 at 871-74). As to all the other aspects of Petitioner's ineffective assistance of counsel claim, Petitioner failed to exhaust his state court remedies.

"The general rule under § 2254 is a habeas petitioner serving a state sentence must first exhaust all available state court remedies." *Paige v. Lee*, 99 F. Supp. 3d 340, 347 (E.D.N.Y. 2015). "State remedies are deemed exhausted when a petitioner has: (i) presented the federal constitutional claim asserted in the petition to the highest state court (after preserving it as required by state law in the lower courts) and (ii) informed that court (and lower courts) about both the factual and legal bases for the federal claim." *Ramirez v. Attorney Gen. of the State of N.Y.*, 280 F.3d 87, 94 (2d Cir. 2001) (citations omitted). "[W]hen the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, federal habeas courts also must deem the claims procedurally defaulted." *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) (quotation omitted).

"New York requires convicted defendants who have an appeal pending or who still can appeal to present all record-based claims in their direct appeal." *Holland v. Irvin*, 45 F. App'x 17, 20 (2d Cir. 2002).  "Under New York law, ineffective assistance of counsel claims that are based on errors or omissions that appear on the record of a defendant's direct appeal must be raised on that direct appeal or they are deemed forfeited." *Brown v. Lee*, No. 14-CV-9718 (KMK), 2019 WL 5078360, at *10 (S.D.N.Y. Oct. 10, 2019)

(citation omitted).  However, New York will allow a defendant to bring a motion under CPL § 440.10 based on a "mixed ineffective assistance of counsel claim that was based in part on the record and in part off the record."  *Morency v. Annucci*, No. 14-CV-672 (DLI) (ST), 2017 WL 4417718, at *2 (E.D.N.Y. Mar. 20, 2017) (quotations omitted).

Here, at least some of the new arguments raised by Petitioner in connection with his ineffective assistance of counsel claim rely on information outside the record—in particular, the argument that that Mr. Mix failed to create a record regarding the court deputy's conduct.  As such, Petitioner could theoretically bring a second CPL § 440.10 motion to assert a further ineffective assistance of counsel claim.  However, a habeas claim "may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies in the courts of the State" where it is "unquestionably meritless."  *Keating v. New York*, 708 F. Supp. 2d 292, 299 n.10 (E.D.N.Y. 2010) (quoting 28 U.S.C. § 2254(b)(2)).  Here, for the reasons discussed below, the Court finds that all of the new arguments raised by Petitioner in connection with his ineffective assistance of counsel claim fall within this category.

A. <u>Arguments Presented to the Appellate Division</u>

1. <u>Failure to Adopt *Pro Se* Motion to Suppress</u>

The Court considers first Mr. Mix's failure to adopt Petitioner's *pro se* submissions regarding the motion to suppress, such that they were not considered by the trial judge. Petitioner contends that his *pro se* submissions established, contrary to the trial court's conclusion, that he had standing to challenge a search warrant for the Upper Falls Boulevard apartment.  However, the trial judge expressly stated on the record that even if

he found that standing existed, he would deny the motion to suppress because "there was adequate probable cause to support the warrant. . . ." (Dkt. 18 at 128). Accordingly, even assuming that Mr. Mix's performance was deficient in this regard, there was no associated prejudice.

**2.  <u>Failure to Seek Recusal or to Develop the Record as to the Same</u>**

As to Mr. Mix's alleged failure to develop the record regarding the trial judge's supposed bias towards and intimidation of Petitioner, Petitioner offers no evidence that the claimed outside-the-record evidence of bias and intimidation existed. Petitioner's self-serving, uncorroborated statements do not establish ineffective assistance by Mr. Mix. *See United States v. Thomas*, No. 11-CR-200, 2014 WL 702107, at *10 (W.D.N.Y. Feb. 24, 2014), *aff'd*, 608 F. App'x 36 (2d Cir. 2015). Moreover, Petitioner's statements are contradicted by the record, which shows that Mr. Mix expressly solicited an opportunity for Petitioner to address with the trial judge Petitioner's grievances regarding his treatment. (*See* Dkt. 18 at 168-70). Mr. Mix further questioned the trial judge regarding the grounds for removing Petitioner from the courtroom and advised the trial judge that he would be reaching out to the supervising judge regarding the matter. (Dkt. 18-5 at 237-40).

It is also clear from the record that Mr. Mix considered making a motion seeking the trial judge's recusal, but ultimately decided not to do so as a matter of strategy, based on his belief that the trial judge "would deny any request for recusal." (Dkt. 17-2 at 442 (in letter to Petitioner dated May 14, 2009, Mr. Mix acknowledging Petitioner's belief that the trial judge "has not come across as totally impartial," but explaining that the trial judge would not grant a recusal request, and that the better course was for Petitioner to "stay

cool" and not "give the Judge an easy reason to do the trial without you")).  Mr. Mix's strategic decision not to pursue a recusal motion that he reasonably believed would not be successful does not constitute deficient performance.

Further, as discussed at length above, there is no basis in the record to conclude that the trial judge was required to recuse himself.  The Appellate Division thus reasonably concluded that Mr. Mix's failure to seek the trial judge's recusal—including by failing to adopt Petitioner's *pro se* motion seeking such relief—did not constitute ineffective assistance of counsel.

### 3.  Failure to Obtain Radio Transmissions

With respect to Mr. Mix's alleged failure to obtain certain radio transmissions made by the surveillance team, Petitioner concedes that Mr. Mix presented a subpoena duces tecum seeking disclosure of all such radio communications.  (Dkt. 46-1 at ¶ 232; *see also* Dkt. 17-2 at 208).  However, Petitioner then argues that the presentation of this subpoena duces tecum was merely a "mask" or "set-up" to cover up Mr. Mix's other deficiencies. (*Id*. at ¶ 233).  This argument utterly fails to establish any deficient performance by Mr. Mix with respect to the radio transmissions and accordingly does not demonstrate any error on the part of the Appellate Division.

### 4.  Filing of General Motion to Dismiss

Petitioner fails to establish any prejudice associated with the claimed generality of the motion to dismiss filed by Mr. Mix.  The only specific argument raised in this regard is that Mr. Mix failed to preserve a challenge to the legal sufficiency of the evidence on the reckless endangerment conviction.  However, as discussed above, the Appellate Division

nevertheless considered the merits of that argument in an alternative holding.  Accordingly, there is no question that the failure to preserve ultimately had no impact on the outcome. *See Ali v. Unger*, No. 6:13-CV-6210 MAT, 2014 WL 257270, at *9 (W.D.N.Y. Jan. 23, 2014) ("[B]ecause the Appellate Division examined the merits of [the petitioner's] legal insufficiency claim notwithstanding the lack of preservation, [the petitioner] cannot demonstrate that he was prejudiced by counsel's omission.").

### 5.  <u>Failure to Withdraw from Representation</u>

Finally, the Appellate Division found that Mr. Mix was not ineffective in failing to withdraw from representing Petitioner.  *Barnes*, 156 A.D.3d at 1420.  The Court finds no error in this determination.  While the relationship between Petitioner and Mr. Mix was certainly strained at times, Mr. Mix and Petitioner communicated and worked together during the trial.  Indeed, at sentencing, Petitioner criticized the trial judge for "disrespecting [his] lawyer and his abilities as a lawyer[.]"  (Dkt. 18-8 at 15).  Moreover, as noted above, there is no constitutional right to "a meaningful relationship between an accused and his counsel."  *Morris*, 461 U.S. at 14 (quotation omitted).

### B.  <u>Arguments Not Presented to the Appellate Division</u>

### 1.  <u>Failure to Pursue and Present an Entrapment Defense</u>

Petitioner faults Mr. Mix for not pursuing and presenting an entrapment defense. Petitioner's theory, which he asserted throughout the investigation and criminal proceedings, appears to be that if police officers watch a crime being committed (in this case, the first burglary committed on October 9, 2008) and do not intervene, that constitutes unlawful entrapment and is a defense to subsequent criminal charges.  (*See, e.g.,* Dkt. 18-

5 at 464 ("[I]t was obvious they was watching me and they was waiting to entrap me committing a crime."); Dkt. 36-2 at 46 ("[I]f you followed me when I did something, why didn't you all stop me? . . .   Because the law say that's entrapment.")).   This is simply wrong as a matter of law.   The New York Penal Law expressly provides that "[c]onduct merely affording a person an opportunity to commit an offense does not constitute entrapment."   N.Y. Penal Law § 40.05.   Instead, "[e]ntrapment, an affirmative defense, requires a defendant to prove by a preponderance of the evidence that [he] engaged in the proscribed conduct because a public servant <u>actively induced or encouraged</u> [him] to do so, and that this inducement created a substantial risk that the defendant would commit the crime although not otherwise disposed to do so."   *People v. Stroud*, 190 A.D.3d 592, 592 (1st Dep't 2021) (emphasis added).   On the facts of the instant matter, there is no possibility that an entrapment defense could have succeeded.   Mr. Mix cannot be found ineffective for having failed to pursue and present a legally meritless defense.

### 2.   Waiver of Privacy Rights

Petitioner contends that Mr. Mix negligently waived Petitioner's privacy rights in the apartment on Upper Falls Boulevard by stating in his motion papers that it was not Petitioner's place of residence.   However, Petitioner himself testified before the grand jury that the apartment on Upper Falls Boulevard was his niece's apartment and he was only staying there temporarily for a few weeks.   (Dkt. 36-2 at 416).   Further, Petitioner told Investigators Ponticello and Mori that his address was 14 Lavender Circle in Henrietta. (*Id*. at 21).   The representations made by Mr. Mix in the motion to suppress—namely, that the apartment on Upper Falls Boulevard was not Petitioner's physical residence and that

Petitioner "often reside[d]" on Lavender Circle in Henrietta (*id*. at 355-56)—thus appear to be based on Petitioner's own previous representations.

Further, the mere fact that an individual does not reside at a particular address does not necessarily mean he lacks a cognizable privacy interest. *See, e.g., Minnesota v. Olson*, 495 U.S. 91, 98-99 (1990) (explaining that "a person may have a sufficient interest in a place other than his home to enable him to be free in that place from unreasonable searches and seizures," and more specifically that "a houseguest has a legitimate expectation of privacy in his host's home"). Accordingly, it is incorrect to suggest that Mr. Mix somehow waived Petitioner's privacy interests in the apartment on Upper Falls Boulevard merely by acknowledging that Petitioner was not a resident of that location.

In any event, Petitioner has failed to identify any prejudice associated with Mr. Mix's assertion that Petitioner did not reside at the apartment on Upper Falls Boulevard. As discussed above, the trial judge made an alternative finding that, even if Petitioner had standing to challenge the search warrant, it was supported by probable cause.

### 3.   Failure to Claim Alteration of the Recording of Petitioner's Interview

Petitioner claims that he told Mr. Mix that the DVD recording of his interview with Investigators Ponticello and Mori had been altered and that Mr. Mix failed to raise this issue with the trial court. (Dkt. 46-1 at ¶ 229). Petitioner does not explain how the DVD was purportedly altered, nor does he explain how Mr. Mix's alleged failure to raise this issue impacted the proceedings. Further, as discussed above, Petitioner did not confess to the burglaries during the course of the interrogation; he instead maintained that he had found the items at issue on the side of the road and picked them up. (*See* Dkt. 36-2 at 45).

Mr. Mix's strategic decision not to pursue Petitioner's vague, self-serving claim that the DVD—which was of limited evidentiary value to the prosecution in any event—had been altered unquestionably does not constitute ineffective assistance of counsel. *See Strickland*, 466 U.S. at 690-91 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation").

### 4.   <u>Failure to Demand Disclosures Regarding the GPS Tracking Device</u>

Petitioner argues that Mr. Mix should have obtained "an order directing the People [to] disclose all reports, positioning, printing, and any other data received and/[or] stored by or within the vehicle tracking device." (Dkt. 46-1 at ¶ 229). However, Mr. Mix filed a motion seeking this information. (Dkt. 17-2 at 215). Mr. Mix was not ineffective simply because this motion was not granted by the trial judge.

Petitioner also argues that Mr. Mix should have obtained the GPS tracking device for examination by a defense expert. (Dkt. 46-1 at ¶ 229). However, the record establishes that Mr. Mix sought just that, but that the GPS device was not available for examination because it had been reused in another investigation. (Dkt. 18 at 160-63) (Mr. Mix stating he had "advised the Court of [his] inclination to have an expert" examine the device but that he had subsequently been advised by the prosecutor that "the device would not be available")). Mr. Mix further indicated that he was considering whether there was a legal basis to seek either exclusion of the GPS tracking device or an adverse inference

instruction.  (*Id*. at 163).  On this record, there is no basis to conclude that Mr. Mix was deficient in failing to procure testing of the GPS tacking device.

### 5.  **Frequency of Meetings with Petitioner**

Petitioner argues that Mr. Mix did not meet with him frequently enough during the course of his criminal proceedings.  (Dkt. 46-1 at ¶ 229).  However, it is clear from the record that Mr. Mix frequently consulted with Petitioner, both in person and through written correspondence.  Further, Petitioner has not identified any possible impact that additional meetings with Mr. Mix could have had on the proceedings.  Petitioner's subjective belief that Mr. Mix should have devoted more time to his case is insufficient to establish either deficient performance or prejudice.

### 6.  **Failure to Obtain Additional Disclosures Regarding Lochnavar Parkway**

Petitioner states that Mr. Mix was ineffective because "On 3/27/09 order for investigation entered only shown pictures of front yard of Lochnavan Parkway and nothing else [sic]."  (Dkt. 46-1 at ¶ 229).  It is unclear what additional steps Petitioner is contending Mr. Mix should have taken with respect to this order, and Petitioner provides no elaboration.  In any event, the record demonstrates that Mr. Mix sought authorization from the trial court to retain a private investigator on behalf of Petitioner (Dkt. 17-2 at 181) and that Mr. Mix further sought disclosure of all photographs and documents related to the burglaries (*id*. at 184-85).  Petitioner's vague assertion that Mr. Mix should have somehow obtained additional photographs of the crime scene at Lochnavar Parkway is plainly

insufficient to demonstrate ineffective assistance of counsel, particularly because Petitioner has offered no theory whatsoever of how any omission in this regard prejudiced him.

### 7. __Failure to Obtain Ordinance__

Petitioner states that "Denial of the defendant's request for ordinance concerning high-speed chase was further denial of 'meaningful representation.'" (Dkt. 46-1 at ¶ 229). Although Petitioner fails to elaborate on this assertion, from the record it is clear that this is related to Petitioner's belief that the involved law enforcement agencies violated their own policies on high-speed chases in connection with the vehicle chase in this matter. (*See* Dkt. 17-2 at 423, 517, 520-21). Petitioner has failed to explain how any violation of such an internal policy would have been relevant to or have had any impact on the outcome of his criminal trial. Mr. Mix cannot have been ineffective by failing to pursue a theory of no potential benefit to Petitioner.

### 8. __Failure to Seek Questioning of Jurors__

Petitioner criticizes Mr. Mix for not seeking to have the jurors questioned about the effect of their having potentially overheard a "thunderously loud swearing match" between himself and a transport deputy on July 16, 2009. (Dkt. 46-1 at ¶ 231)[3]. The trial judge addressed this incident on the record on July 16, 2009, explaining that Petitioner and the

---

[3]   Respondent's memorandum in opposition to the second amended petition addresses a different incident, on July 21, 2009, when Petitioner swore at a member of the trial court's staff while being removed from the courtroom. (Dkt. 36-1 at 46). However, the second amended petition is clear that Petitioner is complaining about Mr. Mix's conduct in connection with the incident on July 16, 2009. (*See* Dkt. 46-1 at ¶ 230 ("Mr. Mix made no assistance effort to conduct a searching inquiry of each individual juror to determine the effect this chaos had on his or her mind on 7/16/09. . . . (emphasis added))).

transport deputies were "alone in the courtroom," or possibly "with Mr. Mix," when one deputy made a comment to another deputy that upset Petitioner.  (Dkt. 18-3 at 597-98).  The trial judge noted the transport deputy had reported the incident and that the trial judge had spoken to the transport deputy and told him "[i]n no uncertain terms . . . not to do that again."  (*Id*. at 598).  Petitioner was allowed to address the matter with the trial judge and made no mention of any concern that the incident had been overheard by the jury.  (*Id*.).

The record thus establishes that this incident took place in the courtroom and not, as Petitioner now asserts, "just outside of door of jury members chambers."  (Dkt. 46-1 at 40).  In any event, Mr. Mix was well within his professional discretion to determine that specifically drawing the jury's attention to the incident (which it was not even clear they had actually overheard) would be prejudicial to Petitioner and was thus strategically unsound.  Further, following a separate incident on July 21, 2009, during which Petitioner had a profane outburst while being removed from the courtroom, the trial judge expressly instructed the jury that they were to disregard the outburst, that they must not allow it to impact their decision in the case, and that their decision must be based solely on their "fair and objective evaluation of the evidence and testimony that was presented."  (Dkt. 18-5 at 226-27).  In other words, the jury was well aware that any outburst from Petitioner that they may have overheard was not a proper part of their deliberations.  On this record, Petitioner also cannot establish prejudice.

### 9.  Failure to Object During Questioning of Surveillance Team Members

Petitioner makes a cursory argument that Mr. Mix was ineffective because he did not "raise a single objection during direct examination . . . of surveillance team

members[.]" (Dkt. 46-1 at ¶ 233).  However, Petitioner has failed to identify any particular

objections that Mr. Mix could or should have made with respect to these witnesses.  These

sorts of vague, conclusory assertions are unquestionably insufficient to establish

ineffective assistance of counsel.  *See, e.g., Wolfson v. United States*, 907 F. Supp. 2d 418,

423-24 (S.D.N.Y. 2012) ("[W]hile the petitioner claims that his counsel should have

objected more during trial, he does not explain what specific objections should have been

made, nor how, because the objections were not made, he was prejudiced in any way.  In

order to succeed on a claim that counsel was ineffective by failing to object, a petitioner

must posit a meritorious objection.").

In sum, none of Petitioner's arguments—whether asserted before the Appellate

Division or not—raise a colorable claim of ineffective assistance of counsel.  It is further

clear from the record in this case that, considered as a whole, Mr. Mix provided Petitioner

with effective assistance.  Accordingly, Petitioner is not entitled to federal habeas corpus

relief on this basis.

## IX.    Cumulative Errors Resulting in Lack of Fair Trial

Petitioner's next argument lists a number of evidentiary rulings by the trial judge

that he claims cumulatively deprived him of a fair trial.  (*See* Dkt. 46-1 at ¶ 242).  Petitioner

raised this argument to the Appellate Division (*see* Dkt. 36-2 at 875), which rejected it,

finding that "defendant was not deprived of a fair trial by the cumulative effect of errors

allegedly committed by the court and defense counsel," *Barnes*, 156 A.D. 3d at 1420.

The Court finds no error in the Appellate Division's resolution of this claim.  In his

appellate brief, Petitioner offered no explanation for his contention that the evidentiary

rulings at issue had violated his constitutional rights, or even for why the rulings were allegedly legally incorrect.  (*See* Dkt. 36-2 at 875-76).  Petitioner has done the same here, merely providing a laundry list of alleged errors without any meaningful explanation for why the trial court's rulings were supposedly incorrect.  "It is well-established that conclusory allegations  not supported by a statement of specific facts do not warrant habeas relief."  *Scott v. Racette*, No. 1:15-CV-00043-MAT, 2018 WL 451825, at *7 (W.D.N.Y. Jan. 17, 2018) (quotation and alteration omitted).  Petitioner has not established that the Appellate Division erred in its assessment of this claim.

## X.    <u>Adjudication as a Persistent Violent Felony Offender</u>

Petitioner's next argument is that the trial judge improperly adjudicated him as a violent persistent violent felony offender and that New York's statutory scheme for designating an individual a persistent violent felony offender violates the Sixth Amendment.  (Dkt. 46-1 at ¶ 244).

Petitioner's state-law challenge to his classification as a persistent violent felony offender is not cognizable on federal habeas corpus review.  *See Rupert v. Noeth*, 510 F. Supp. 3d 3, 6 (W.D.N.Y. 2020).  To the extent Petitioner is now claiming that New York's sentencing scheme is unconstitutional, he did not raise this argument before the state courts and it is procedurally defaulted.  Petitioner has not identified any cause for the failure to previously raise this argument, nor can he demonstrate actual innocence.  *See Dretke v. Haley*, 541 U.S. 386, 388 (2004).

In any event, "N.Y. Crim. Proc. Law § 70.08, the persistent violent felony offender statute that [Petitioner] challenges, has routinely been upheld as constitutional."  *Terry v.*

*Conway*, No. 11-CV-2647 (RRM), 2016 WL 3983516, at *9 (E.D.N.Y. July 25, 2016) (collecting cases).  Petitioner is not entitled to federal habeas corpus relief on this basis.

## XI.   Harsh and Excessive Sentence

Finally, Petitioner argues that his modified sentence of 35 years to life is harsh and excessive, thus violating his right to substantive due process.  "A challenge to the term of a sentence does not present a cognizable constitutional issue if the sentence falls within the statutory range." *Martin v. Lord*, 378 F. Supp. 2d 184, 188 (W.D.N.Y. 2005) (citing *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992)).  Petitioner is not entitled to federal habeas corpus relief on this claim.

## XII.   Motion for Immediate Release

On August 20, 2021, Petitioner filed a motion seeking immediate release and further requesting in the alternative that the undersigned be required to issue a decision on his second amended petition within 30 days.  (Dkt. 60).  The Court having now resolved the second amended petition in favor of Respondent, Petitioner's motion for immediate release (Dkt. 60) is denied as moot.

## CONCLUSION

For the foregoing reasons, the Court finds that Petitioner is not entitled to federal habeas corpus relief and denies the second amended petition.  (Dkt. 46).  The Court denies Petitioner's motion for immediate release (Dkt. 60) as moot.  The Clerk of Court is instructed to close this case.  Further, because Petitioner has not made a "substantial showing of the denial of a constitutional right," *see* 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:      November 8, 2021
              Rochester, New York